# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

United States of America,

               Plaintiff,

     v.

Rodolfo Anguiano, Jr.,

               Defendant.

**MEMORANDUM OPINION
AND ORDER**
Criminal No. 17-135(1) ADM/DTS

---

David P. Steinkamp, Assistant United States Attorney, Minneapolis, MN, on behalf of Plaintiff.

Mark D. Nyvold, Esq., Fridley, MN on behalf of Defendant Rodolfo Anguiano, Jr.

---

## I. INTRODUCTION

This matter is before the undersigned United States District Judge on remand from the Eighth Circuit Court of Appeals. The issue on remand is whether the police would have sought a search warrant for Defendant Rodolfo Anguiano Jr.'s ("Anguiano") hotel room and a car in the hotel parking lot if an earlier unlawful search by the police had not occurred. For the reasons set forth below, the Court finds the police would have sought a search warrant.

## II. BACKGROUND[1]

On Friday May 5, 2017, Bloomington Police Officer Jacob Gruber ("Officer Gruber") was patrolling a high crime area of the city when he saw a red Volkswagen Jetta with California license plates arrive at the Days Inn motel and leave ten minutes later. Hr'g Tr. [Docket Nos. 114, 115] at 34, 36–38, 41–42. Officer Gruber had seen the Jetta at the Days Inn the week before, and had learned from his routine checks that the vehicle's registration was expired and

---

[1] The detailed factual background of this case is set forth in the Court's December 19, 2017 Memorandum Opinion and Order ("Suppression Order") [Docket No. 160] and is incorporated by reference.

the registered owner, Elizabeth Sanchez, was not listed on the hotel roster.  Id. at 38.  When Officer Gruber observed the car on May 5, he again performed a vehicle registration check and confirmed the registration was still expired.  Id. at 42.  He followed the Jetta as it left the Days Inn parking lot and executed a traffic stop after seeing the car's tires cross over the lane divider. Id. at 42–43.

Upon approaching the open driver's side window of the Jetta, Officer Gruber was struck by an "overwhelming" smell of air freshener coming from the car and saw a large number of dryer sheets spread over both the front and back floor.  Id. at 46–47.  Officer Gruber knew from his narcotics training that drug traffickers use dryer sheets to mask the odor of drugs to confuse drug-detecting dogs.  Id. at 47–48.  Anguiano, the car's sole occupant, told Officer Gruber the car had a leak and smelled like gas.

Anguiano's drivers license was from California, which Officer Gruber knew to be a drug source state.  Id. at 49, 54.  Anguiano did not have proof of insurance or a title for the Jetta.  Id. at 49–50.  He told Officer Gruber he recently bought the vehicle at an auction and would be selling it in Minnesota and flying back to California on Monday.  Anguiano also told Officer Gruber he had been in town for three days to attend his cousin's wedding that was taking place on Saturday.  Id. at 50.  He said he had initially been staying at the Days Inn but was now staying at the nearby Embassy Suites on American Boulevard.  Id. at 50–51.  When Officer Gruber told Anguiano he had seen the Jetta a week earlier, Anguiano explained that his cousin had driven the car to Minnesota and he had flown to Minnesota because he had to work.  Id. at 51–52.  Officer Gruber knew from his training that drug traffickers commonly pay another person to drive their "load" car to a location and then fly to the location to retake possession of the car.  Id. at 52.

Officer Gruber learned through dispatch that Anguiano had prior arrests for alien smuggling, controlled substance, and possession of pills. Id. at 52–53. He asked Anguiano if he had ever been arrested. Id. at 53. Anguiano initially responded that he had not been in trouble for drugs before, but then said he had been arrested for an offense involving diet pills. Id. at 53, 102. Anguiano's nervousness visibly increased as Officer Gruber's questions focused more on drug activity. Id. at 54. Officer Gruber concluded Anguiano was lying to him. Id. at 54–55.

Anguiano declined to consent to a search of the Jetta, and a drug-detecting canine was called. Id. at 54. The canine showed interest in the car's undercarriage but did not positively alert to the presence of narcotics. Id. at 57. Officer Gruber decided to release Anguiano without giving him a ticket. Id. at 57–58.

As Officer Gruber returned Anguiano's license to him, Anguiano opened his wallet and Officer Gruber then saw what appeared to be a Drug Enforcement Agency ("DEA") badge affixed to the inside flap of the wallet. Id. at 58–61. The wallet also held about a dozen plastic cards that Officer Gruber presumed to be credit cards. Id. at 59. Officer Gruber called his supervisor, Sergeant Cory Cardenas ("Sergeant Cardenas") to discuss what he had seen. Id. at 63, 271, 273. Sergeant Cardenas contacted Officer Tom Maloney ("Officer Maloney"), a DEA task force officer with the Bloomington Police Department, to determine whether the DEA badge was genuine. Id. at 204, 206. Officer Maloney confirmed Anguiano was not a DEA agent. Id. at 206–07. Officer Maloney also told Sergeant Cardenas that information from the DEA's Intelligence Center in El Paso, Texas showed Anguiano had been arrested previously for alien smuggling and "some kind of drug case," and had traveled to or from Mexico approximately 20 times in the past couple of years. Id. at 208–10. Sergeant Cardenas then drove

to the scene, where he and Officer Gruber arrested Anguiano for identity theft and obstructing legal process.  Id. at 63, 115–16, 276.

After Anguiano was arrested, the officers performed an inventory search of his car and found a satchel with an imitation DEA badge and imitation FBI badge, four $1,000 bundles of cash, and credit cards with names other than Anguiano's.  Id. at 64–65, 279.  The interior of the Jetta appeared to have been altered because the dashboard was loose and came apart easily.  Id. at 65, 279–80.  No drugs or contraband were found in the vehicle.  Id. at 65, 116–17.

Officer Gruber and Sergeant Cardenas then drove to the Embassy Suites to further investigate their suspicions that Anguiano was engaged in drug trafficking.  Id. at 131, 180–81. Sergeant Cardenas has testified that although the officers had no solid evidence to charge Anguiano with a drug related crime at this point, they remained suspicious because Anguiano had given inconsistent stories about how and why he had come Minnesota and had lied about his criminal history.  Id. at 281, 338.  As a result, they decided to do a "knock and talk" at Anguiano's hotel room to possibly develop probable cause through a consensual encounter with the person answering the door.  Id. at 282–83, 338.  Sergeant Cardenas felt it would have been negligent of the officers not to follow up on their highly suspicious observations at the traffic stop.  Id. at 338.

The officers went to room 714 of the Embassy Suites, which the front desk confirmed was registered to Anguiano.  Id. at 68.  They knocked on the door and Defendant Zyaira Marie Gavino ("Gavino") opened the door and allowed them to enter.  Id. at 69–70, 283–85. Immediately inside Room 714 was a living room area that included a pull-out couch and a sink. Id. at 71, 76, 191, 304.  Defendant Kelvin Baez ("Baez") was sitting on the couch in the living

room.  Id. at 71.  A back bedroom with an open door could be seen down an open hallway.  Id. at 71, 76, 190.  When initially scanning the living room, Officer Gruber and Sergeant Cardenas observed a glass methamphetamine pipe with residue in plain view on an end table next to Baez.  Id. at 72–73, 286.  The sight of the pipe caused Officer Gruber to believe there was probable cause that other evidence such as methamphetamine might be in the room.  Id. at 74, 305.

Gavino told Officer Gruber they were from Florida, were visiting a friend at the hotel, and had been staying with the friend a few days.  Id. at 75, 324.  Gavino and Baez did not know the friend's real name and knew him only by his nickname.  Id.

Officer Gruber asked for Gavino's consent to search the room, and she said yes.  Id. at 75.  Officer Gruber searched Gavino's backpack and found an owner's manual for a Chevy Equinox that matched a set of GM keys Officer Gruber saw on the living room couch.  Id. at 78.  The officers also found four .22 round bullets in the backpack, causing Officer Gruber to believe a gun may be somewhere in the room.  Id. at 78, 193.

Officer Gruber then began to search the entire suite.  Id. at 76–79.  The armoire in the back bedroom was locked with a rigid chain lock.  Id. at 76–77.  Also in the back bedroom, the officers observed in plain view what appeared to be pound packaging in an open-topped garbage can.  Suppression Order at 8.  In the far corner of the bedroom, the officers saw a cell phone that had been propped up to face the armoire.  Hr'g Tr. at 77.  The cell phone appeared to be monitoring the armoire by streaming a live video image from the phone camera to a Facebook Live website.  Id.  Officer Gruber asked Baez where narcotics might be if any were in the room, and he testified that Baez responded, "Well, in the armoire, obviously."  Id. at 79.  Based on this

comment, Officer Gruber requested a K-9 officer to conduct a dog sniff of the room.  <u>Id.</u>  at 81.

The drug dog alerted to the armoire and to a dresser.  <u>Id.</u>

Officer Gruber then "popped off" the front panel of a sink cabinet in the back bedroom

and found a plastic bag that contained a pillowcase with two large bundles of what he believed to

be multiple pounds of methamphetamine.  <u>Id.</u> at 79.  Upon finding the suspected drugs, the

officers decided to freeze the room and obtain a search warrant to search the rest of the room,

including the armoire.  <u>Id.</u> at 80, 135–38, 290–91, 307, 335–36.  The search warrant also

included a Chevy Equinox in the hotel parking lot that the officers linked to the keys found on

the couch in the hotel room.  <u>Id.</u> at 81.  A drug dog had alerted to the presence of drugs in the

Equinox before the officers applied for the search warrant.  <u>Id.</u>

Officer Gruber and Sergeant Cardenas have both testified about their reasons for seeking

a search warrant after finding the methamphetamine in the vanity.  Officer Gruber testified that

prior to finding the drugs, he did not believe a search warrant was needed because Gavino had

given her consent to search the room and had not revoked it.  <u>Id.</u> at 74–75, 79–80, 140, 185,

305–06.  He routinely knocks on hotel doors to ask for consent, and was thus aware that a search

warrant was not his only option for searching the room.  <u>Id.</u> at 195.

Officer Gruber further testified that if he had he not received Gavino's consent at the

time he saw the pipe, he would have frozen the hotel room based on what he had seen.  <u>Id.</u> at

74–75.  He decided to seek a warrant after finding the methamphetamine in the sink cabinet

because he believed "that once a person can be arrested for something you find during a consent

search that their consent then goes away, once there's an arrestable offense, so then we obtain a

search warrant to continue searching."  <u>Id.</u> at 136; <u>see also</u> <u>id.</u> at 184–85 (further testimony by

Officer Gruber stating his belief that consent "goes away" once an arrestable offense exists).  He also testified that "once there's a reason to arrest somebody . . . we generally get a warrant to shore things up, make sure there is [sic] no mistakes made."  Id. at 135.

Sergeant Cardenas testified that the officers sought a search warrant even though they had consent to search because the armoire was locked with a padlock that  "would take something intrusive as far as . . . clipping that lock, whatever tool that we would have to use."  Id. at 291–92.  Sergeant Cardenas believed evidence was likely in the armoire because it was locked and being actively surveilled with a cell phone.  Id. at 291.  Although Officer Maloney was not present when the officers decided to seek the search warrant, he has testified that the police typically get a search warrant when they "are going to take bolt cutters and do damage to something."  Id. at 235.

After the search warrant arrived, the officers searched the armoire and found additional methamphetamine and a handgun.  Id. at 83–84.  They also searched the Chevy Equinox and found methamphetamine, marijuana, and a gun.  Id. at 84.  Gavino and Baez were then arrested and transported to the Bloomington police department.  Id. at 82–83, 217, 220–21.

On June 6, 2017, Anguiano was indicted on one count each of Conspiracy to Distribute Methamphetamine and Possession with Intent to Distribute Methamphetamine.  Indictment [Docket No. 28].  He moved to suppress evidence obtained after he was arrested, arguing the inventory search of the Jetta was unlawful because the police lacked probable cause to arrest him, and that the hotel room and Equinox searches were illegal because the police lacked consent or a valid warrant for the searches.

This Court found the officers lacked probable cause to arrest Anguiano, and as a result the evidence found in the inventory search of the Jetta was suppressed. The Court also suppressed the methamphetamine found in the sink vanity. Suppression Order at 21, 23. In reaching this conclusion, the Court determined the officers' search of the hotel room was initially lawful because Gavino consented to a search of the room and had apparent authority to do so. Id. at 19–20. The officers' initial entry into the back bedroom of the suite was also proper as a protective sweep, because bullets were found in Gavino's backpack. Id. at 20–21. However, once the officers saw the locked armoire and the cell phone surveillance system, they had knowledge of facts strongly suggesting Gavino did not have mutual use or control of the back bedroom. Id. at 21. At that point, Officer Gruber's belief that he had valid third-party consent to search the back bedroom was no longer reasonable. Id. The officers should have stopped their search at that time, frozen the scene and applied for a search warrant. Id. Instead, Officer Gruber conducted an intrusive search of the sink vanity in the back bedroom by removing a panel from the vanity and searching the space inside. The Court thus held the warrantless search of the vanity was unlawful and the evidence found in the vanity must be suppressed.

The Court denied suppression of the evidence found in the armoire and Equinox, holding this evidence was acquired through the after-acquired search warrant, which was an independent source not tainted by the illegal searches of the Jetta or vanity. Id. at 22–23. The Court determined the search warrant was valid because even when the unlawfully obtained information was redacted from the search warrant application affidavit, the remainder of the affidavit included abundant information to establish probable cause. Id.

After the Court's suppression rulings, Anguiano entered a conditional plea of guilty that preserved his right to appeal the Suppression Order. On appeal, the Eighth Circuit determined this Court addressed only the second of two elements required under the independent source doctrine articulated in <u>Murray v. United States</u>, 487 U.S. 533 (1988). <u>See generally</u> Remand Order [Docket No. 540]. The case was remanded to this Court for a finding on whether the doctrine's first element is satisfied. This element requires the Court to determine "whether police would have sought the warrant even if the initial unlawful search had not occurred." Remand Order at 2.

### III. DISCUSSION

The exclusionary rule prohibits the introduction of evidence obtained as a direct result of an unlawful search, as well as evidence later discovered and found to be derivative of the unlawful search. <u>Murray</u>, 487 U.S. at 536–37; <u>United States v. Swope</u>, 542 F.3d 609, 613 (8th Cir. 2008). However, the exclusionary rule does not apply when the connection between the unlawful search and the evidence to be excluded becomes "so attenuated as to dissipate the taint." <u>Murray</u>, 487 U.S. at 537; <u>Swope</u>, 542 F.3d at 613.

"The independent source doctrine provides that evidence initially discovered during an unlawful search, but later obtained independently through activities untainted by the illegality, may be admitted into evidence." <u>United States v. Khabeer</u>, 410 F.3d 477, 483 (8th Cir. 2005). The doctrine is rooted in the principle that "the interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a *worse*, position that they would have

been in if no police error or misconduct had occurred." Murray, 487 U.S. at 537 (quoting Nix v. Williams, 467 U.S. 431, 443 (1984)) (emphasis in original).

Under the independent source doctrine, a search warrant obtained after an illegal search is an independent source if both of the following are true:  (1) the police would have applied for the warrant had they not acquired the tainted information; and (2) the search warrant application affidavits support probable cause after the tainted information has been redacted.  Swope, 542 F.3d at 613–14.

The Eighth Circuit warns that the test for the first element is not whether the police's decision to seek a warrant was prompted by what they found during their prior illegal search. Id. at 615.  Such an inquiry "would require suppression if the officers' decision to seek the warrant was in fact prompted by what they saw during the prior illegal entry, regardless of whether they would have applied for a warrant had they not made that entry."  Id.  As such, a "prompted" test has the potential to contravene the independent source doctrine's underlying principle that suppression should not place the police in a worse position than they would be in had they not acquired the illegal information to begin with.  Id.  Accordingly, "the proper test under Murray's first prong is whether the police would have applied for the warrant had they not made the prior illegal observations."  Id.

Applying the proper test here, the only plausible conclusion to be drawn from the record is that the officers would have sought a search warrant even if they had not found the methamphetamine in the vanity.  Prior to the illegal search, the officers had lawfully obtained knowledge of the following facts that, in their totality, strongly suggest Anguiano was engaged in drug trafficking:  Anguiano was driving a car with California license plates that he claimed to

own but that was registered in someone else's name; the car's registration was expired; Anguiano lacked proof of insurance; his cousin had driven the car from California and he (Anguiano) had flown separately to Minnesota, a practice common among drug traffickers; the floor of Anguiano's vehicle was covered in dryer sheets, which drug traffickers use to confuse drug-detecting dogs; Anguiano had a prior drug arrest in 2013 that Officer Gruber felt he was being evasive about; he had a fake metal DEA badge in his wallet; two individuals from Florida were in the hotel room registered to Anguiano (who was from California) and told the officers they had been staying in the room with him for days but did not know his real name; one of the individuals had four bullets in her luggage; a methamphetamine pipe was on a table in plain view in the room; and pound sized drug packaging material was in a garbage can. Most significantly, the officers had lawfully observed the highly suspicious, heavily secured and surveilled armoire. Baez said if drugs were hidden they would "obviously" be in the armoire. Just as Sergeant Cardenas testified it would have been negligent of the officers not to conduct a "knock and talk" at the hotel room after what they had learned during the traffic stop, the officers would have been derelict in their duty to investigate had they not sought a search warrant for the hotel room based upon what they had seen and learned before searching the vanity.

Officer Gruber testified that when he first walked into the room, the sight of the methamphetamine pipe raised probable cause that other evidence of methamphetamine might be in the room, and he would have frozen the room and called for a search warrant at that time had Gavino not given consent to search. Officer Gruber understood that applying for a search warrant was an option for searching the room but did not get one because Gavino's consent

made a warrant unnecessary. Upon finding the methamphetamine in the vanity, Officer Gruber believed Gavino's consent had ended and that a warrant was required to continue searching.

Sergeant Cardenas' testimony also establishes that the officers would have applied for a warrant even if the unlawful search had not occurred. Sergeant Cardenas believed a search warrant was necessary before the officers could intrusively remove the padlock from the suspicious armoire. Officer Maloney's testimony corroborates that police typically seek a search warrant before causing damage to an item being searched. Thus, the record clearly establishes that even if the unlawful search of the vanity had not occurred, the officers would have applied for a warrant to continue their search.

Resisting this conclusion, Anguiano argues the independent source doctrine does not apply because the police's decision to get the warrant was based on the drugs found in the illegal search. See Def.'s Mem. [Docket No. 544] at 3 ("[T]he police sought the warrant because of the drugs they found in the illegal search, and the basis for the arrest it created, which the officers testified they needed before they would seek a search warrant."); Def.'s Reply Mem. [Docket No. 559] at 3 ("[T]he probable cause to arrest that the illegal search created was why the officers sought the warrant."). This argument is flawed because, as the Eighth Circuit emphasized in Swope, the proper inquiry is not whether the decision to seek a warrant was in fact prompted by what the police saw during the illegal search. 542 F.3d at 615. Rather, the test is "whether the police would have applied for the warrant had they not made the prior illegal observations." Id. For the reasons discussed above, the Court finds the police would have applied for the warrant.

Accordingly, the first element of the independent source doctrine is satisfied. The Court has previously determined that the doctrine's second element is met. Suppression Order at

22–23.  Thus, the independent source doctrine applies to the evidence found in the armoire and Chevy Equinox.

## IV.  CONCLUSION

Based upon the foregoing, and all of the files, records and proceedings herein, **IT IS HEREBY ORDERED** that the first element of the independent source doctrine is satisfied.  The District Court Clerk is directed to return the record, as supplemented, to the Eighth Circuit Court of Appeals for disposition by the appeal panel.

BY THE COURT:


_____s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  June 11, 2019.